**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**November 15, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1912**

Cir. Ct. No. 2020GN214

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT III**

IN THE MATTER OF THE GUARDIANSHIP AND
PROTECTIVE PLACEMENT OF M. B.:

F. A. W.,

PETITIONER-RESPONDENT,

V.

M. B.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Brown County: TIMOTHY A. HINKFUSS, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Mae[1] appeals the circuit court's finding that she is incompetent and the resulting order establishing the guardianship of her person and of her estate under WIS. STAT. ch. 54 (2019-20),[2] as well as an order for her protective placement under WIS. STAT. ch. 55. Mae argues that the circuit court's finding of incompetency should be reversed because the court failed to make the requisite findings of fact under WIS. STAT. § 54.10(3)(a) and because there was insufficient evidence to support findings under § 54.10(3)(a)2. and 3. Mae also contends that the court failed to order the least restrictive protective placement. We reject Mae's arguments and affirm.

## BACKGROUND

¶2 In November 2020, Mae was admitted to a hospital after falling and hitting her head. At the time, Mae was seventy-five years old, her overall condition was noted as "poor," and she was diagnosed with "hypokalemia, generalized weakness, altered mental status, and alcohol dependence." Around this same time, Mae's husband suffered a stroke. Both he and Mae were later moved to a skilled nursing home for their respective care.

¶3 In December 2020, Mae's brother-in-law, Frank, petitioned for, and was granted, a temporary guardianship of Mae based on a "reasonable likelihood" that she was incompetent. Shortly thereafter, Frank also petitioned for permanent guardianship of Mae's person and her estate and for protective placement of Mae.

---

[1] For ease of reading, we use pseudonyms in this confidential matter when referring to the parties.

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

The circuit court subsequently appointed Dr. Kevin Miller to examine Mae with respect to her competency and her need for protective placement.

¶4    At an April 2021 hearing, Dr. Miller testified that he had evaluated Mae in the nursing home and prepared a report detailing his conclusions about her competency, which were to a reasonable degree of professional certainty. Miller summarized some of his conclusions regarding Mae's impairments, testifying that Mae had severely impaired memory, reasoning and executive functioning. He further noted that Mae had mild impairments with respect to her language and communication as well as her attention and concentration. Miller found, however, that Mae's orientation to time and location was still intact.

¶5    Doctor Miller elaborated on some of these conclusions. He described how Mae could not recall, after a thirty-minute delay, nearly any of the "story elements" from a formal memory test. Mae also could not recall who Miller was at the end of the evaluation, despite Miller introducing himself at the beginning of the evaluation and reminding Mae that they had met "a number of times at least ten years ago." In addition, Miller testified that Mae "was not able to do any [hypothetical] calculations" involving simple monetary transactions, which was "a significant decline from her previous functioning." Miller acknowledged that Mae was still a "gifted communicator and socially adept," but he recognized that Mae's ability to communicate "mask[ed] some of her deficits."

¶6    As a result of the evaluation, Dr. Miller formally diagnosed Mae with a "[m]ajor neuro-cognitive disorder due to dementia from alcohol use disorder," which Miller believed was a permanent condition. Miller opined that Mae's condition was the result of her "drinking herself almost to death basically and falling repeatedly." Miller recommended that the circuit court order

protective placement for Mae where she could have twenty-four-hour supervision in a secure setting. Miller conceded, however, that the nursing home in which Mae currently resided was not the least restrictive environment for her and that the least restrictive environment would be in a community-based residential facility (CBRF).

¶7     Lisa Moreland, a case manager with the Adult Protective Services unit in the Brown County Health and Human Services Department, also testified at the hearing. Moreland stated that she prepared a comprehensive evaluation of Mae, which involved reviewing Mae's medical records, speaking to Mae, speaking to a social worker, and speaking to Frank. Based on her evaluation, Moreland agreed with Dr. Miller that Mae appears to "meet the criteria for a guardian of person and estate." She also agreed that protective placement was appropriate. Moreland said that Mae needed twenty-four-hour supervision to monitor her alcohol consumption, her potential falls, and her nutrition.

¶8     Moreland acknowledged that a nursing home was not the least restrictive environment for Mae, but Moreland rejected the proposition that Mae could return home. Moreland recognized that the cost of twenty-four-hour care at home—which would be needed to keep Mae safe—would be "astronomically high." Moreland testified that Mae and her husband likely had less than $365,000 in their bank account and that it would cost approximately $15,000 to $20,000 per month for Mae to live at home, which did not account for Mae's husband's care or for the necessary modifications to the home. Moreland also noted that using protective services was not a feasible plan because Mae could refuse to allow those services into her home.

¶9     Mae also testified at the hearing.  She stated that she wanted to live "in [her] home" and that she would be willing to accept "some" in-home services. She further stated, however, that around-the-clock care was not necessary because a care worker would have to use the bedroom on the first floor of the home, which Mae wanted her husband to use.  Mae estimated that she received about $445 in social security per month.  On cross-examination, Mae said that the ability to "enjoy [a] daily cocktail" was not a motivating factor for her request to live at home.

¶10     Following the witnesses' testimony, Mae's guardian ad litem (GAL) recommended that Frank be appointed guardian of Mae's person and estate.  The GAL rejected the idea of Mae returning home and recommended protective placement in a "CBRF type facility."

¶11     The circuit court subsequently granted the petition for guardianship, and it appointed Frank as guardian of Mae's person and estate.   The court explained:

> I do find that the statutory criteria for guardian of the person and of the estate have been met.  I find that based upon the doctor's report from Dr. Miller, his testimony and the testimony that was provided to me here today.
>
> I looked at the comprehensive evaluation of Ms. Moreland as well.  And I think that was very informative as to what this case is all about.

¶12     The circuit court also granted the petition for protective placement. It found, based upon Dr. Miller's report and testimony, "that the statutory criteria for the protective placement have been met."  The court additionally found that Mae had "a primary need for residential care and custody and that she is incapacitated as the doctor's report indicates."  The court determined that Mae's

protective placement "should be at a CBRF or assisted living facility" with twenty-four-hour supervision. Although the court acknowledged Mae's desire to live at home, the court recognized that the home was not currently a suitable environment because it was not modified to meet Mae's needs.

¶13    After the hearing, the circuit court issued written orders granting the petitions for guardianship and protective placement. Mae now appeals. Additional facts will be provided as necessary below.

## DISCUSSION

¶14    We employ a mixed standard of review to a circuit court's decisions to order guardianship and protective placement. We will not overturn a circuit court's factual findings unless they are clearly erroneous. WIS. STAT. § 805.17(2); *see also **Coston v. Joseph P.***, 222 Wis. 2d 1, 22, 586 N.W.2d 52 (Ct. App. 1998). Whether the evidence satisfies the relevant legal standards, however, is a question of law that we review de novo. ***Coston***, 222 Wis. 2d at 22.

### I.  The circuit court's findings under WIS. STAT. § 54.10(3)(a)

¶15    A circuit court may establish the guardianship of an individual's person and estate if the court finds that the individual is incompetent under WIS. STAT. § 54.10(3)(a). Section 54.10(3)(a) provides that a court can find an individual incompetent "only if the court finds by clear and convincing evidence that all of the following are true:"

> 1. The individual is aged at least 17 years and 9 months.
>
> 2. For purposes of appointment of a guardian of the person, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the

individual is unable to meet the essential requirements for his or her physical health and safety.

3. For purposes of appointment of a guardian of the estate, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions related to management of his or her property or financial affairs, to the extent that any of the following applies:

a. The individual has property that will be dissipated in whole or in part.

b. The individual is unable to provide for his or her support.

c. The individual is unable to prevent financial exploitation.

4. The individual's need for assistance in decision making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, a supported decision-making agreement under [WIS. STAT.] ch. 52, or other means that the individual will accept.

¶16    Mae argues that the circuit court's finding of incompetency must be reversed because the court failed to make specific findings of fact with respect to each element set forth in WIS. STAT. § 54.10(3)(a). According to Mae, § 54.10(3)(a) expressly requires separate findings as to each element in the statute before a court can find that an individual is incompetent. Mae therefore contends that the court violated § 54.10(3)(a) by not discussing each of the required findings in its oral decision but by stating simply: "[T]he statutory criteria for guardian of the person and of the estate have been met."

¶17    We agree with Mae's general proposition that a circuit court is required to make specific findings of fact with respect to each element set forth in WIS. STAT. § 54.10(3)(a). As expressly provided in § 54.10(3)(a), a court may find that an individual is incompetent for purposes of guardianship "*only if* the

7

court finds by clear and convincing evidence that all of the [subdivisions in § 54.10(3)(a)] are true." *See **id.*** (emphasis added). Put differently, the subdivisions in § 54.10(3)(a) are the ultimate facts needed to find a person incompetent for purposes of guardianship. *See Ultimate fact*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A fact essential to the claim or the defense."). Significantly, in all matters tried without a jury, a court

> shall find the ultimate facts and state separately its conclusions of law thereon. The court shall either file its findings and conclusions prior to or concurrent with rendering judgment, state them orally on the record following the close of evidence or set them forth in an opinion or memorandum of decision filed by the court.

WIS. STAT. § 805.17(2). By making the specific findings of fact set forth in § 54.10(3)(a), the court protects the rights of the litigants and facilitates review of the record by an appellate court. *See **Hochgurtel v. San Felippo***, 78 Wis. 2d 70, 85, 253 N.W.2d 526 (1977).

¶18 Although a circuit court must make specific findings of fact with respect to each element set forth in WIS. STAT. § 54.10(3)(a), we reject Mae's contention that the court failed to make the requisite findings in this case. After the evidentiary hearing, the court filed a "Determination and Order" using a standard court form: Form GN-3170 (Nov. 2020). This form order, which Mae fails to address in her argument, contains the court's written findings of fact with language that mirrored each of the elements in § 54.10(3)(a). The completed form reflects that the court specifically found each of the ultimate facts set forth in § 54.10(3)(a). These findings are therefore minimally sufficient. *See* WIS. STAT. § 805.17(2) ("If an opinion or memorandum of decision is filed, it will be sufficient if the findings of ultimate fact and conclusions of law appear therein.").

¶19     We recognize that the circuit court made the minimum findings of fact required by law, but we suggest that a better practice is for circuit courts to state more detailed findings of fact on the record.  Although we ultimately affirm the court's orders, for reasons discussed further below, we caution that courts would be best advised to make more detailed findings of fact to further facilitate our review and—most importantly—to safeguard a litigant's rights.

## II. The sufficiency of evidence to support the circuit court's findings

¶20     Mae argues that even if the circuit court made the requisite findings of fact, there is insufficient evidence to support a finding that she is incompetent. In particular, Mae challenges the sufficiency of evidence with respect to WIS. STAT. § 54.10(3)(a)2. and 3.[3]

¶21     Mae has failed to show, however, that the circuit court's findings under WIS. STAT. § 54.10(3)(a)2. and 3. are clearly erroneous.  A circuit court's findings of fact are not clearly erroneous unless they are against the great weight and clear preponderance of the evidence, even if the evidence may have presented competing factual inferences.  *State v. Wiskerchen*, 2019 WI 1, ¶30, 385 Wis. 2d 120, 921 N.W.2d 730.  We will affirm a court's findings of fact as long as the evidence would permit a reasonable person to make the same finding.  *Id.*  "We

---

[3] Although we do not discern Mae to be arguing that the evidence was insufficient to support a finding under WIS. STAT. § 54.10(3)(a)4., we nevertheless note that sufficient evidence supported such a finding.  Doctor Miller opined in his report that less restrictive interventions— such as training, education, support services, assistive devices, advanced planning, or a representative payee—would not eliminate Mae's need for guardianship because "[h]er deficits were too severe."  Miller also testified at the evidentiary hearing that Mae's condition was permanent.

9

search the record not for evidence opposing the circuit court's decision, but for evidence supporting it." *Id.*

¶22    The record contains sufficient evidence to support the circuit court's finding that, because of her impairment, Mae "is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that [she] is unable to meet the essential requirements for … her physical health and safety."[4]    *See* WIS. STAT. § 54.10(3)(a)2.    Doctor Miller testified that Mae's condition at the time of her hospitalization was the result of "drinking herself almost to death basically and falling repeatedly," notions which Mae "adamantly rejected."    Miller also noted that Mae could not recall why she was at the facility even though Miller and Mae had discussed the events in "some detail" an hour earlier in the evaluation.    Miller stated that Mae "would drink herself to death and be malnourished unless she were supervised around the clock 24/7."

¶23    In addition, Dr. Miller's report, which was introduced as an exhibit at the evidentiary hearing, reflected that Mae did not know what medications were prescribed to her, she disagreed that she had any impairments, and "she insisted she could live on her own in her home with no assistance."    The report also contains Miller's conclusion that Mae's incapacity would interfere with her ability to meet the essential requirements of her health and safety.    Miller testified at the evidentiary hearing that the conclusions in his report were to a reasonable degree of professional certainty.

---

[4] "'Meet the essential requirements for physical health or safety' means perform those actions necessary to provide the health care, food, shelter, clothes, personal hygiene, and other care without which serious physical injury or illness will likely occur." WIS. STAT. § 54.01(19).

¶24 Moreland reiterated and agreed with many of Dr. Miller's observations. She testified that Mae's alcohol consumption, her recurrent falls, and her malnutrition all contributed to her hospitalization. Moreland also expressed concern about Mae's judgment concerning medication, noting that Mae could not explain why she was prescribed certain medications but nonetheless believed she did not need those medications.

¶25 Sufficient evidence also supported the circuit court's determination that, because of her impairment, Mae "is unable effectively to receive and evaluate information or to make or communicate decisions related to management of … her property or financial affairs, to the extent that" Mae has property that will be dissipated in whole or in part, is unable to provide for her support, or is unable to prevent financial exploitation. *See* WIS. STAT. § 54.10(3)(a)3. Moreland testified that Mae had some financial resources, including social security and a recent inheritance of about $365,000—although some of the inheritance had already been used to pay for nursing home care.

¶26 Doctor Miller also testified that, during the evaluation, Mae "couldn't even begin to calculate" how much change she should receive if she had $20 and spent $8.50. His report also noted that Mae could not "calculate rent for a year if she knew the monthly total ($300)." Miller concluded in his report that Mae's incapacity would interfere with her ability to manage her property and financial affairs, to address a risk of her property being dissipated in whole or in part, to provide for her own support, and to prevent financial exploitation. Again, Miller testified at the evidentiary hearing that these conclusions were to a reasonable degree of professional certainty.

¶27 Mae's argument with respect to the sufficiency of evidence is largely centered on her ability to communicate, which Dr. Miller found to be only mildly impaired. Mae points out that she is "a gifted communicator and socially adept" and that she "clearly and rationally" communicated "her desire to go home" at the hearing.

¶28 Be that as it may, Mae's ability to communicate, by itself, does not show the circuit court's findings of fact are clearly erroneous. An individual's inability to effectively communicate, because of his or her impairment, is one potential basis for a court to find that WIS. STAT. § 54.10(3)(a)2. and 3. have been satisfied, but a court can also base its findings on an individual's inability to effectively receive and evaluate information or to effectively make decisions. *See* § 54.10(3)(a)2. and 3. ("[B]ecause of an impairment, the individual is unable effectively to receive and evaluate information *or* to make *or* communicate decisions …." (emphasis added)). In other words, a court's findings under § 54.10(3)(a)2. and 3. could be supported by sufficient evidence even if it were undisputed that the individual had strong communication skills. Here, the evidence largely focused on how Mae's severely impaired "memory," "reasoning" and "executive functioning" interfered with her ability to effectively receive and evaluate information and to effectively make decisions. Accordingly, even if the court credited testimony that Mae had strong communication skills, sufficient evidence still supported the court's findings under § 54.10(3)(a)2. and 3.

¶29 In sum, there was sufficient evidence to support the circuit court's findings under WIS. STAT. § 54.10(3)(a)2. and 3. The evidence permitted a finding that, due to her impairment, Mae would be unable to meet the essential requirements for her physical health and safety because she could not effectively receive and evaluate information or effectively make decisions. *See*

§ 54.10(3)(a)2. The evidence also permitted a finding that Mae could not, because of her impairment, effectively receive and evaluate information or effectively make decisions related to the management of her property or financial affairs, to the extent that Mae has property that will be dissipated in whole or in part, is unable to provide for her support, or is unable to prevent financial exploitation.[5] *See* § 54.10(3)(a)3.

## III. The circuit court's finding of the least restrictive protective placement

¶30    Mae next argues that the circuit court "failed to order the least restrictive manner of placement consistent with [her] needs." She contends that she should be "permitted to choose between" in-home care and a residential facility.

¶31    Mae's arguments largely ignore our standard of review. If a court orders protective placement—as the circuit court did in this case—the placement "shall be provided in the least restrictive environment and in the least restrictive manner consistent with the needs of the individual to be protected and with the resources of the county department." *See* WIS. STAT. § 55.12(3); *see also* WIS. STAT. § 54.01(18) (defining "least restrictive"). Whether a protective placement is in the least restrictive environment and is in the least restrictive manner are questions of fact, which we review under the clearly erroneous standard. *See*

---

[5] Mae argues that if the circuit court failed to find her incompetent or if the evidence did not support the incompetency finding, then the protective placement order must be reversed. *See* WIS. STAT. § 55.08(1)(b) (requiring an adult individual to have been determined incompetent by a circuit court before a court can order protective placement). For the reasons explained earlier, however, the court made the requisite findings of fact under WIS. STAT. § 54.10(3)(a) and those findings were supported by sufficient evidence. Therefore, the protective placement order cannot be reversed under § 55.08(1)(b). Mae does not challenge any of the court's other findings of fact under § 55.08(1).

13

*Fond du Lac County v. J.G.S., Jr.*, 159 Wis. 2d 685, 687, 465 N.W.2d 227 (Ct. App. 1990) (applying clearly erroneous standard to a finding of the "least restrictive placement").

¶32     Here, the circuit court found that the least restrictive protective placement for Mae would be in a secure setting, at either a CBRF or an assisted living facility, with twenty-four-hour supervision and monitored egress.  The court also expressly rejected the alternative idea of Mae returning home.  The court's protective placement order subsequently directed that Mae "should be relocated [from the nursing home] to a CBRF when an appropriate facility willing to accept [Mae] is identified and arrangements can reasonably be made for an orderly transfer."[6]

¶33     The evidence in the record would permit a reasonable person to make these same findings.  *See Wiskerchen*, 385 Wis. 2d 120, ¶30.   Both Dr. Miller and Moreland recommended that Mae be transferred to a CBRF as soon as possible and that she be under twenty-four-hour supervision.   They also testified that such a placement would be the least restrictive environment for Mae. In addition, Moreland outright rejected the notion that Mae could return home. She testified that returning home was not economically feasible because:  (1) Mae and her husband likely had less than $365,000 in their bank account; (2) twenty-four-hour supervision at home would cost an estimated $15,000 to $20,000 per month; (3) modifying the home to make it safe would further deplete

---

[6] Although Mae appears to suggest that the protective placement order improperly kept her in the nursing home until arrangements could be made for a CBRF, she does not develop any argument or cite any legal authority in support of that notion.  Therefore, we need not address the issue.  *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (we need not address an argument that is undeveloped and unsupported by legal authority).

their assets; and (4) Mae's husband also needed significant care which would impose additional expenses.

¶34 Mae challenges Moreland's testimony by arguing that her care would be "extremely expensive" at either her home or a residential facility. She also argues that her husband's placement was not relevant to the circuit court's determination of the least restrictive environment for her.

¶35 Both of these arguments, however, are misplaced. Mae does not identify any evidence in the record to support her argument that care in a CBRF would cost equal to or more than the estimated $15,000 to $20,000 per month for her to have in-home care with twenty-four-hour supervision. Mae also fails to recognize that Moreland's testimony regarding Mae's husband largely focused on the cost of care for both Mae and her husband. Moreland testified that the estimated cost of in-home care for Mae does "not tak[e] into account [Mae's husband's] need for care, whether it's at home or in another facility. That will also be an expense that [affects their assets]." Thus, Moreland's testimony regarding Mae's husband was relevant because Mae's husband's care would ultimately affect Mae's ability to afford in-home care with twenty-four-hour supervision.

¶36 Mae also asserts that both Dr. Miller and Moreland "agreed that [Mae] could go home with protective services." We, however, cannot find any support for this assertion in the record. In addition to Moreland's concerns about the economic feasibility of Mae returning home, Moreland also explained that using protective services was "not a feasible plan" because Mae could refuse to allow those services into her home. Although Miller testified that it would be "theoretically possible" for Mae to return home if she had sufficient assets to pay

for modifications to her home and for twenty-four-hour supervision, Miller acknowledged that he did not know the specific details of Mae's financial situation. Thus, the circuit court could reasonably credit Moreland's testimony that using protective services in Mae's home was not a viable option.

¶37 In short, the circuit court's finding of the least restrictive protective placement for Mae was not clearly erroneous.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.